

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Sandra Wilkinson*  
*Chief, Major Crimes*  
*Sandra.Wilkinson@usdoj.gov*

Suite 400  
36 S. Charles Street  
Baltimore, MD 21201-3119

DIRECT: 410-209-4921  
MAIN: 410-209-4800  
FAX: 410-962-0716

September 15, 2015

Premal Dharia  
Assistant Federal Public Defender  
Federal Public Defender's Office  
Tower II, 9th floor  
100 South Charles St., Baltimore, MD 21201 – 2705

    RE:    <u>United States v. Raymon Carter</u>, ELH 15-0400

Dear Ms. Dharia:

    This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by Friday, September 16, 2015, it will be deemed withdrawn. The terms of the agreement are as follows:

<u>Offense of Conviction</u>

    1.    The Defendant agrees to waive indictment and plead guilty to a Superseding Criminal Information which will charge him with Rioting in violation of 18 U.S.C. § 2101(a)(2). The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

<u>Elements of the Offense</u>

    2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

        a.    The defendant used any facility of interstate or foreign commerce.

        b.    The use was with intent to organize, promote, encourage, participate in, or carry on a riot.

        c.    During the course of such use or thereafter, the defendant performs or attempts to perform any other overt act (in this case, an arson) for any purpose specified in 18 U.S.C. § 2101(a)(1) through (a)(4).

1

## Penalties

3.      The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: five years imprisonment, a three year term of supervised release, and a fine of $250,000. In addition, the Defendant must pay $100.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

   a.      If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b.      The Defendant has the right to have his case presented to a Grand Jury, which would decide whether there is probable cause to return an indictment against him. By agreeing to proceed by way of Information, he is giving up that right, and understands that the charges will be filed by the United States Attorney without the Grand Jury.

   c.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

   d.      If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

   e.  The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

   f.  If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against his. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

   g.  By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

   h.  If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

   i.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

  5.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C.§§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

  6.  This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt,

and to the following applicable sentencing guidelines factors:

      a.    The base offense level is determined by the Arson guidelines set forth in U.S.S.G. § 2K1.4. Based on the value of the property burned, the base offense level is 2 plus the offense level from §2B1.1 (Theft, Property Destruction, and Fraud).

      b.    The base offense level is 7 plus the loss to the victim. U.S.S.G. § 2B1.1(a). (SUBTOTAL: 2 + 7 = 9)

      c.    Pursuant to § 2B1.1 (b)(1), there is a 14 level increase for estimated loss. (SUBTOTAL: 9 + 14 = 23). For purposes of this enhancement, the government is agreeing to apply the loss adjustment based on the anticipated amendments to the Sentencing Guidelines to be effective in November 2015.

      d.    There is a 2 level increase because the offense involved the conscious or reckless risk of death or serious bodily injury. U.S.S.G. 2B1.1(b)(15). (SUBTOTAL 23 + 2 = 25)

      e.    This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

**Thus, the final adjusted offense level is 22.**

7.    The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income. At the time of this plea agreement, the parties believe that the Defendant is a Criminal History Category II.

8.    This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range and application of the 18 U.S.C. § 3553(a) factors, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

### Plea Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C)

9.    The parties stipulate and agree that, pursuant to Federal Rule of Criminal

Procedure 11(c)(1)(C), a sentence of forty-eight (48) months in the custody of the Bureau of Prisons, plus a term of three years of supervised release and full restitution to the victim, based on the defendant's conduct and of a sum to be determined by the Court, is the appropriate disposition of this case. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea agreement pursuant to the provisions of Federal Rule of Criminal Procedure 11(d)(2)(A). Should the Government so elect, it will be afforded the opportunity to seek an Indictment on any charges that can be filed for the conduct of the Defendant.

Obligations of the United States Attorney's Office

10. At the time of sentencing, this Office will move to dismiss the Indictment against the Defendant.

11. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the Indictment that this Office has agreed to dismiss at sentencing.

12. Other than the offense to which the Defendant has agreed to plead guilty, and with the exception of crimes of violence, crimes against children and tax violations, this Office will not prosecute the Defendant for any other violations of federal criminal law that arise from the facts stipulated by the Defendant and this Office, attached hereto and incorporated herein, that form the basis of this plea agreement.

13. The government has conferred with an appropriate representative of the Baltimore City State's Attorney's Office (SAO) who has agreed that the SAO will not prosecute the Defendant for the same conduct to which he is pleading guilty to in this federal case.

Restitution

14. The Defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses, based on the Defendant's conduct. The Defendant reserves the right to address the appropriate final sum of restitution with the Court prior to the Court issuing a Restitution Order. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

Collection of Financial Obligations

15.     The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.  In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.  The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs.  The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five year period of incarceration and fine.

Waiver of Appeal

16.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

        a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

        b.      The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, and term or condition of supervised release).  The Defendant reserves the right to appeal an order of restitution in this case.

        c.      Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

        d.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

Obstruction or Other Violations of Law

17.     The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case.  In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who

6

prepares the Presentence Report, (iii) moves to withdraw his guilty plea or (iv) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

18.   The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information.

### Entire Agreement

19.   This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
Sandra Wilkinson
Assistant United States Attorney

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, I agree that it is true and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

9/14/15
Date

Raymon Carter (signature)
Raymon Carter

I am Mr. Carter's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

9/14/15
Date

Premal Dharia, AFPD

**EXHIBIT A**

**STIPULATED FACTS**

*The undersigned parties hereby stipulate and agree that if this case had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Raymon CARTER, age 24, is a resident of Baltimore, Maryland.

As detailed below, on April 27, 2015, CARTER maliciously damaged and destroyed by fire a building in Baltimore Maryland that housed the CVS Pharmacy at 2509 Pennsylvania Avenue, Baltimore, Maryland, 21217 (hereinafter "CVS"). CVS is a store within one of the largest pharmacy chains in the United States. CVS dispenses medications and sells merchandise. CVS was operating in a facility used in interstate commerce and engaged in an activity affecting interstate commerce.

On Monday, April 27, 2015, at approximately 2:45 p.m., riots and widespread looting erupted across Baltimore City, Maryland, following the funeral of Freddie Gray who died after being arrested by the Baltimore Police Department (BPD) on April 12, 2015.

CARTER was at his grandmother's home on Callow Avenue on the afternoon of April 27, 2015. CARTER used the telephone, a facility of interstate commerce, to speak to family members with the intent to participate in the riot. CARTER used the phone to discuss his plans to go to the riot scene. At one point, he told a family member that he knew the metro station at North and Pennsylvania had been closed and, in fact, the station had been closed at approximately 4:29 p.m. due to the unrest in the streets. CARTER left the home on Callow Avenue (which is less than a mile from the CVS) and proceeded on foot to the area of North and Pennsylvania Avenue where the CVS was located.

1

During the investigation, the ATF recovered and obtained video surveillance from the interior of CVS, Baltimore City Watch Cameras, Maryland Transit Administration (MTA) Police cameras and various media outlet. During the late afternoon time period, CARTER is captured on video on the streets in the vicinity of the CVS. He is observed watching the rioting activity around him including the setting of various small fires. As set forth below, CARTER is also observed on video inside the CVS.

At approximately 4:30 p.m., looters broke through the main entry doors of CVS (which had been locked and closed due to the unrest) and began removing merchandise and pharmaceuticals. CARTER is captured on street cameras at approximately 5:20 p.m. walking north up Pennsylvania Avenue. At approximately, 5:28 p.m. CARTER trespassed into the CVS from the main entrance and headed to the pharmacy. At 5:29 p.m., CARTER used an open flame to illuminate pharmaceuticals on the shelves and to look at the pharmaceuticals. At 5:30 p.m., CARTER climbed over a desk, located in front of the pharmaceutical safe and unsuccessfully attempted to move the safe. At 5:34 p.m., CARTER proceeded to hit the safe with a large object. The safe did not open and CARTER walked away.

Three (3) separate times between approximately 6:16:17 p.m. and 6:19:26 p.m., CARTER went to and from the southeast corner of the CVS. This area of CVS contained a large number of CVS paper products available for resale. CARTER's intent was to start a fire. At one point he picked up something in the sales aisle on the way to the southeast corner. At 6:19:34 p.m., CARTER disappeared out of camera view, behind the shelves in the southeast corner. CARTER's efforts to light the fire in the corner were ultimately successful and within approximately 23 seconds, at approximately 6:19:57 p.m., a flash of light can be seen on the video along the east wall of the southeast interior corner of the CVS. At that point, CARTER ran

from the corner, down an aisle, toward the main entrance, to exit the CVS. The time on the video is approximately 6:20:06 p.m.

By 6:22 p.m., flames became visible on the video. Approximately 14 seconds later, at 6:22:33 p.m., CARTER was seen walking toward the CVS exit, looking back toward the southeast corner to observe the fire. At the same time, looters begin running toward the exit. Between 6:19:57 (flash of light) and 6:21:30 (exit), no other individuals other than CARTER are visible on the video in the southeast corner where the fire originated. CARTER left the scene by walking east along North Avenue.

At approximately 6:28 p.m., the Baltimore Fire Department (BFD) was dispatched to reports of a fire at CVS. Upon the firefighters' arrival, heavy smoke was observed venting from the main entry doors at the southwest corner, and the roof. BFD vented windows on the south and west facing walls and conducted an exterior fire attack by introducing water streams through the building's doors and window openings. BPD established riot lines in an attempt to control the crowds while BFD worked to extinguish the fire. The circumstances were dangerous and CARTER's actions recklessly caused a risk of serious bodily injury to the firemen, the policeman and the crowd.

CARTER was definitively identified by citizens after the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) released two (2) still photographs from the videos to the media and announced a $10,000 reward for information leading to his identification, arrest and conviction.

A federal magistrate judge authorized a Criminal Complaint and arrest warrant for CARTER on June 25, 2015. On Monday, June 29, 2015, the ATF released a wanted poster for information leading to CARTER's apprehension. On Wednesday, July 1, 2015, ATF received a hotline tip that a male resembling CARTER had just exited Jacks Liquor Store, located at 141

3

West Hamburg Street, Baltimore, MD 21230.  The ATF responded to canvass the area and observed a male matching CARTER's description across the street from Jacks Liquor Store, in an alleyway.  The male was speaking with another male in a red shirt.  The male in the red shirt appeared to notice the ATF as they drove past the alleyway.  When the ATF exited the car, both men fled. The ATF returned to the vehicle to canvass the area for the male in the white shirt, believed to be, and later identified as, CARTER.

Approximately thirty (30) minutes later, CARTER was seen behind an apartment complex then running towards Hamburg Street into the parking lot of a 7-11 Store.  The ATF followed.  CARTER ran down Winter Street into an auto mechanics' lot.  A citizen directed the ATF back towards Hanover Street where CARTER was observed in the rear yard of 1020 Hanover Street.  The ATF agent drew his weapon, ordering CARTER to stop and get on the ground.  CARTER initially denied but then admitted he was Raymon CARTER. He was searched incident to arrest and had little in his pockets except two black Bic lighters.

The ATF National Response Team (NRT) responded to Baltimore to assist with investigating fire scenes across the city.  The NRT consists of ATF Special Agents from across the country who are specifically trained in fire scene investigations.  The NRT conducted its fire investigation at CVS and determined that the CVS was doing business in a single story structure, rectangular in shape, with a flat roof and was approximately 9,190 square feet. The building was bordered by a parking lot to the north, an alley and a six (6) story senior center to the east, an open courtyard to the south and Pennsylvania Avenue to the west.  The total loss to the building structure alone, as a result of the fire, is estimated at approximately $1.1 million.  The parties are still investigating and discussing figures related to the sum of restitution that CARTER is liable for, based on his conduct.  The parties have not reached an agreement on the amount of such

4

restitution, but will present all relevant information to the Court prior to the sentencing in this matter.

The NRT determined the fire originated in the southeast corner of the sales floor. The NRT classified the fire as incendiary (arson); that is, the fire was deliberately started. It is the opinion of the participating certified fire investigators that an arsonist ignited available combustibles in that location of CVS with an open flame. According to the NRT, the combustibles ignited likely include paper towels, toilet paper and cardboard items. This is exactly what CARTER did (ignite combustibles, that is, items such as paper towels and toilet paper, by an open flame) in the southeast corner of the CVS on April 27 at approximately 6:19 p.m.

I have read this statement of facts, and carefully reviewed it with my attorney. I acknowledge that it is true and correct.

9/14/15
Date

Raymon Carter

I am Raymon Carter's attorney. I have carefully reviewed every part of this Factual Stipulation with him. He advises me that he understands, agrees to it and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

9/14/15
Date

Premal Dharia, Esq.